CHARLES STROM AND FLORA STROM, HUSBAND AND WIFE, PETI-
TIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1798.    Promulgated March 29, 1946.

*L. L. Thompson, Esq.*, and *L. B. Donley, Esq.*, for the petitioners.
*W. H. Payne, Esq.*, for the respondent.

OPINION.

LEECH, *Judge*: This case presents a novel question not heretofore decided by the courts. May the Federal Government tax income realized by an Indian who has not received a certificate of competency and is, accordingly, an incompetent ward of the Government, when such income is derived by him from the exercise, on common unallotted tribal property, of a tribal right guaranteed by treaty?

Petitioners contend that the imposition of a tax on income derived from fishing operations on the reservation constitutes a denial of the free and unrestricted right to fish guaranteed to them by treaty. It is urged that, although the treaty makes no mention of taxation and there is no expressed exemption, the accepted rule is that such treaties are to be liberally construed for the protection of the Indian and the maintenance of his rights thereunder as he understood them to be. It is argued that, in view of the conditions under which the treaty was executed and the fact that, since time immemorial, these particular Indians were dependent upon their fishing operations for their support and maintenance, a fair and just construction of the guarantee of their fishing rights without interference is that it carried the meaning to them, in the execution of the treaty and the surrender of their lands, that on the reservation set aside they alone would be permitted to fish and to do so without burden or restriction of any character. It is argued that the understanding of the Indians in executing the treaty was that as to their fishing on the reservation the Federal Government was precluded from taking from them any portion of the fish they caught or the proceeds of the sale or barter of such fish in securing for themselves those things necessary for their support and maintenance.

Respondent emphasizes that since the Quinaielt Treaty provides for no immunity from taxation, such immunity may not be implied. He takes the position that the income in question thus comes clearly within the definition of section 22 (a) of the Internal Revenue Code, that obviously it does not fall within any one of the exclusions of subsection (b), and that it is therefore taxable under section 11 of the code, which imposes the tax on such income of "every individual." He points out that petitioners, although Indian wards of the Government, are citizens and enjoy the protection and rights of such citizenship, and that accordingly no injustice is done to wards by the Federal Government in requiring them to bear their proportionate share as citizens of the general burden of taxation.

The fishing rights guaranteed under article 2 of the treaty, as set out in our findings, and similar rights guaranteed in the same language under treaties with other tribes, have been before the courts in several cases. In none of them, however, was the present question involved. Those cases involved attempts by the State or Federal Governments to restrict, curtail, or regulate fishing privileges specifically reserved to the Indians by treaty. The decisions there apply to the question here only to the extent that they establish that fishing rights guaranteed by treaty are the property of the Indians, that neither the State nor the Federal Government may, by statute, deny their exercise, and that in construing the treaties their provisions must be given effect in ac-

cordance with the understanding of the Indians when such treaties were made. *Tulee* v. *Washington*, 315 U. S. 681; *Seufert Bros. Co.* v. *United States*, 249 U. S. 194; *United States* v. *Winans*, 198 U. S. 371.

In *Mason* v. *Sams*, 5 Fed. (2d) 255, the treaty here pertinent was before the court in connection with the determination of the character of the rights possessed by the Indians to fish on the reservation in the Quinaielt River. The Commissioner of Indian Affairs, in the exercise of his statutory authority to make rules and regulations respecting the restricted Indians, had promulgated certain regulations specifying the times and manner in which fishing should be done and prohibiting the use of nets such as the Indians used. Such regulations further provided that the fish caught should be sold only to a buyer licensed by the Government, that payments for the fish were to be made to the Indian agent, and that an amount be withheld therefrom ranging from 5 percent on any amount from $500 to $1,000 to 25 percent on amounts in excess of $3,000. The money so withheld was to be remitted to the Bureau of Indian Affairs to be used by it for the care of the aged and indigent members of the tribe or for other purposes incidental to the maintenance of the Indian Agency. In this case the court held that the Indians possessed the right to fish without any regulation or control by the Federal Government, either over their fishing operations or the proceeds from the sale of the fish they caught.

There is no doubt, we think, that prior to the decisions by the Supreme Court in *Choteau* v. *Burnet*, 283 U. S. 691, and *Superintendent of Five Civilized Tribes* v. *Commissioner*, 295 U. S. 418, the administrative interpretation of the revenue acts in the light of various Indian treaties was that the income derived by restricted Indian wards from tribal or allotted Indian lands was exempt from tax. 34 Ops. Atty. Gen. 275; 34 Ops. Atty. Gen. 302; 34 Ops. Atty. Gen. 439; 35 Ops. Atty. Gen. 1; 35 Ops. Atty. Gen. 107. This conclusion is supported by the fact that, with one exception, no attempt was made over a long period of years to tax the income derived by these petitioners and other Indians from fishing operations on the Quinaielt River. This one exception was that in 1922 the Indians were directed to file income tax returns, although such direction was later withdrawn.

In *Choteau* v. *Burnet, supra*, the petitioner was a member of the Osage Tribe of Indians, holding a certificate of competency. He was held taxable upon his proportionate share of the tribal income from oil and gas leases made by the tribe on lands purchased for it by the United States with money belonging to the tribe and held in trust for it. The Court there said:

The language of sections 210 and 211 (a) subjects the income of "every individual" to tax. Section 213 (a) includes income "from any source whatever." The intent of Congress was to levy the tax with respect to all residents of the United States and upon all sorts of income. The act does not expressly exempt

the sort of income here involved, nor a person having petitioner's status respecting such income, and we are not referred to any other statute which does.

In reaching its conclusion in this case the Court pointed to the fact that the income sought to be taxed was in the "untrammeled ownership" of the petitioner and that his power to use it was absolute. Accordingly the claim that petitioner was to be considered restricted as to this income and therefore exempt from tax thereon was denied. In *Superintendent of Five Civilized Tribes* v. *Commissioner*, *supra*, the Court held that income received by a Creek Indian, without limitation on its use, derived from the investment of funds arising from restricted lands, was subject to Federal income tax in the hands of the Indian, notwithstanding that the Indian was a ward of the United States. The Court emphasized that the taxing provisions of the several revenue acts are broad and that nothing therein indicates that Indians are to be excepted. It relied particularly on the facts that there was no agreement with the Creeks or any act of Congress dealing with their affairs which expressed a definite intent to exclude such income from taxation.

In *A. M. Landman, Superintendent of the Five Civilized Tribes*, 42 B. T. A. 958; affd., 123 Fed. (2d) 787; certiorari denied, 315 U. S. 810, we had the question of whether the estate of a restricted full-blood Creek Indian was subject to Federal estate tax. It was contended that the understanding of the Indian was that his land should be nontaxable, that this embraced every form of taxation, and that the understanding of the Indian must be given effect. In that case we said:

Apparently all of these arguments were pressed upon the United States Supreme Court in the case of *Superintendent of the Five Civilized Tribes* v. *Commissioner*, 295 U. S. 418. The Supreme Court rejected the contentions in holding that the income of a trust fund held for a restricted Indian was subject to income tax. The Supreme Court said:

Nor can we conclude that taxation of income from trust funds of an Indian ward is so inconsistent with that relationship that exemption is a necessary implication. Nontaxability and restriction upon alienation are distinct things. *Choate* v. *Trapp*, 224 U. S. 665. The taxpayer here is a citizen of the United States, and wardship with limited power over his property does not, without more, render him immune from the common burden.

The petitioner contends that the above cited case is not in point in this proceeding for the reason that the Court was there dealing only with income derived from the investment of surplus funds of a restricted Indian and not with income derived from royalties on oil produced from the Indian's land. It is apparent, however, from the rationale of the opinion and from the cases cited, that the court intended to make no distinction between a restricted Indian's income derived from the investment of surplus funds and his other taxable income. The point was made that "The language of sections 210 and 211 (a) [Revenue Act of 1918] subjects the income of 'every individual' to tax." There-

fore the income of the restricted Indian is subject to tax the same as the income of an unrestricted Indian or any other citizen or resident. \* \* \*

In affirming our decision in this case, the court said:

Likewise in *Choteau* v. *Burnet, supra,* the court refused to extend immunity from a tax sought to be imposed by the national government upon income of a restricted Indian, although such income was derived from his share of a departmental oil and gas lease, the proceeds of which were held by the Superintendent as tribal trust funds until they were disbursed to the restricted Indian. The court held that after the funds were paid over to the unrestricted Indian, they no longer retained a restricted character and the recipient thereof was not entitled to tax immunity thereon.

In *Superintendent* v. *Commissioner, supra,* the court denied the claimed exemption from income tax (Revenue Act of 1928, Sec. 11 and 12, 26 U. S. C. A. Int. Rev. Acts, page 352) on income derived from the restricted allotment of a fullblood Creek Indian held by the United States in trust for him under the direction of the Superintendent. The court found nothing in the treaties, agreements, and acts of Congress, upon which the Superintendent now relies, which would justify exclusion [sic] from taxation the income derived from the restricted land, concluding that "the taxpayer here is a citizen of the United States, and wardship with limited power over his property does not, without more, render him immune from the common burden." The court made a clear distinction between a tax levied upon land as such, and the income derived therefrom.

The question here is different from that presented in the last three cited cases in that the income presently involved was derived personally by a restricted Indian in his exercise of a right guaranteed to him by treaty. The principles laid down in the cited cases would appear to apply with equal force to the instant situation and deny the exemption. There is here no express exemption from tax in the treaty with the Quinaielt Indian Tribe. The income which respondent seeks to tax is in the "untrammeled possession" of the petitioners, with no restriction upon its use by them. We do not agree with the argument that the imposition of the tax upon income earned by these petitioners in carrying on a commercial fishing business on the Quinaielt River is a restriction upon the *right* to fish guaranteed by the treaty. The Quinaielt Indians on the reservation were as free to fish in the Quinaielt River after the imposition of an income tax as they were prior to that time. The disputed income tax is not a burden upon the *right to fish,* but upon the income earned through the exercise of that right.

Likewise, we do not agree with the position of petitioners that in the making of the treaty the understanding of the Indian of its terms was that the Government was precluded from laying any such burden upon him. It is a far cry from the fishing operations of the members of an uncivilized tribe of Indians at the time of the execution of this treaty, and the commercial fishing business now carried on by these petitioners. Of course there is nothing to indicate that when the Quinaielt Treaty was executed such taxes as are here involved had been even conceived.

The parties to that treaty, certainly, did not contemplate the present situation.

It is undoubtedly true that the Federal Government is not empowered to lay a tax upon the exercise of the right of the petitioners to fish in the waters of this reservation and the petitioners may not be restrained or regulated in the exercise of that right except by their own tribal council. They are, however, citizens of the United States, engaged in a gainful occupation from which they derive income which is theirs to use and spend as they see fit. Therefore, since there is no contractual or statutory exemption to which they can point, or we have found, exempting them from payment of the tax imposed on the income of "every individual,"

*Decision will be entered for the respondent.*

Reviewed by the Court.