**CAPOEMAN et ux. v. UNITED STATES et al.**

No. 1101.

United States District Court
W. D. Washington, S. D.

Aug. 27, 1952.

Kenneth R. L. Simmons, Billings, Mont., for plaintiffs.

Thomas R. Winter, Attorney, Bureau of Internal Revenue, Seattle, Wash., Ellis N. Slack, Acting Asst. Atty. Gen., Andrew D. Sharpe and J. W. Hussey, Sp. Assts. to Atty. Gen., J. Charles Dennis, U. S. Atty., Seattle, Wash., for defendants.

JAMES ALGER FEE, District Judge.

Horton Capoeman and Emma Capoeman, his wife, both citizens of the United States, hereinafter referred to as "plaintiffs," are noncompetent Indian wards of the United States under the supervision and control of the Taholah Indian Agency. They are full-blood Quinaielt Indians, born and residing on the Quinaielt Reservation in the State of Washington.

Under the provisions of the Quinaielt Treaty with the United States, dated July 1, 1855, and January 25, 1856, 12 Stat. 971, Quinaielt Indian tribal lands were transferred to the United States, but there was reserved therefrom and set apart for the exclusive use of the members of the Quinaielt tribe an area designated in accordance with the terms of the treaty. On October 1, 1907, pursuant to the terms of the treaty and the General Allotment Act of February 8, 1887, 24 Stat. 388, 25 U.S.C.A. § 331 et seq., a trust patent was issued to Horton Capoeman for approximately ninety-three acres of tribal land within the Quinaielt Reservation. The fee title to this land was and still is held by the United States in trust for Horton Capoeman, and said land was not and still is not subject to alienation nor encumbrance by plaintiffs except with the consent and approval of the proper agents of the United States.

During the year 1943, pursuant to a contract of sale entered into by the Bureau of Indian Affairs of the United States Department of Interior providing for the cutting and sale of timber from plaintiffs' allotment, $8,418.28 worth of timber was cut, sold and paid for. Of the $8,418.28 received, $1,537 was distributed to plaintiffs, and the balance of $6,878 (with $3.28 unaccounted for) was placed in trust by the United States and maintained, subject to withdrawal solely by or for their use and benefit, in an account for the plaintiffs.

Plaintiffs filed a joint income tax return for the calendar year 1943, reporting long-term capital gain from the sale of the timber in that year. The return was filed on October 10, 1947, and on that date plaintiffs paid the taxes shown due.

On January 2, 1948, plaintiffs filed a claim for refund of the taxes paid, and contended that their income derived from the sale of timber from the allotted land was not subject to federal income taxation because such taxation would be in violation of the provisions of the Quinaielt Treaty and of the trust patent. The claim for refund was denied by the Bureau of Internal Revenue on January 21, 1948, and this action was instituted on March 3, 1948.

The refund must be allowed.

The United States now has a sum of money in trust for these Indian wards. It is demonstrable that this amount is part and parcel of the corpus of a trust estate which the government has held ever since the treaties of 1855 and 1856.[1] Before that date, the Indians had

---

1. 12 Stat. 971.

rights of occupancy in a vast territory. These were ceded to the United States in return for protection and tutelage.[2] But there was expressly reserved the title to a tract of land.[3] The United States held the legal title thereof as trustee. When the allotment acts[4] were given effect, there was no change in this situation. The Indians simply relinquished their respective claims to a large area of communal lands, and each respectively accepted in lieu thereof equitable title to a definite parcel of land allotted in severalty.[5] At the end of the trust period, a conveyance was to be made to the Indian or his heirs of such parcel in fee "discharged of said trust and free of all charge or incumbrance whatsoever."[6] This is a simple restatement of the obligation of the trustee. As a result, the United States has no power to levy a duty or impost or charge upon the lands over which it has plenary power by virtue of ownership and sovereignty. The State of Washington can levy no tax on the whole or any part or parcel thereof.[7] After the conveyance, which must be authorized by the Indian in order to burden him with the weight of obligation, the national and state governments are empowered to tax this land and its increments as the real property of any other citizen.[8] It follows that, until the land is thus conveyed, it cannot be treated as "capital" or a "capital asset." For, by such classification, the United States would be violating not only a moral right of the Indian, but would be violating the statute by placing a "charge or incumbrance" on the land. The state cannot collect back taxes upon land before the date of conveyance in fee to the Indians. The federal government has no right upon a sale by the Indian, immediately after a patent to him in fee, to tax the difference in value between the date of the treaty, or even March 1, 1913, and the date of sale as a capital asset. By that process it could destroy the value of the trust property. Likewise, there could be no tax upon a sale by the United States of ten acres out of an hundred acre allotment with the consent of the allottee before the end of the trust period. The reason is that the government had the real property in trust before the sale of part thereof, and the price received is only a substitute charge. But here the sale was of part of the realty. Timber, until severed, is part of the land.[9] No distinction can be drawn between the operation and the sale of a parcel out of a larger area.[10]

During the long history of the Chancelors and in the equity courts, cutting of timber by one not the owner of the fee constituted waste, and the proceeds of timber cut by a trustee was a part of the trust estate. If the timber had remained standing upon the land until patent issued in fee, neither state nor national government could have taxed it because it was part of the trust property. Nor on sale of the severed timber after patent could the increment in value be based upon a date prior to the transfer of the land to the Indian.

This holding is not inconsistent with decisions that the proceeds of fructus industriales such as grasses cut from the land or the fruits of fisheries appurtenant can be taxed. There no portion of the corpus of the trust is taxed, but only the profit therefrom. It is more doubtful that the pro rata share of the individual Indian in the distribution of the yield of tribal communal lands can be taxed, but at least a basis for rationalization exists. In the

---

2. Article I of the Treaty, 12 Stat. 971.

3. Article II of the Treaty, 12 Stat. 971.

4. 24 Stat. 388, as amended, 25 U.S.C.A. §§ 331–357.

5. 25 U.S.C.A. § 331.

6. 25 U.S.C.A. § 348.

7. The tax exemption runs equally against state and federal governments. See Landman v. United States, 71 F.Supp. 640, 647, 109 Ct.Cl. 1; Oklahoma Tax Commission v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612.

8. 25 U.S.C.A. § 349.

9. Northern Pacific Railroad Co. v. Paine, 119 U.S. 561, 564, 7 S.Ct. 323, 30 L.Ed. 513.

10. This same reasoning was used in connection with oil and gas royalties by the Supreme Court in Parker v. Riley, 250 U.S. 66, 70, 39 S.Ct. 405, 63 L.Ed. 847.

instant situation, the trust is violated by an uncompensated diminution of the corpus.

For the reasons indicated, it is held that the refund is allowed.[11]

---

11. Under the above analysis, the following cases are distinguishable and have no application to the instant situation: Jones v. Taunah, 10 Cir., 186 F.2d 445; Choteau v. Burnet, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353; Superintendent of Five Civilized Tribes v. Commissioner, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517; The Cherokee Tobacco, 11 Wall. 616, 20 L.Ed. 227; Strom v. Commissioner of Internal Revenue, 6 T.C. 621.