FREEMAN P. WALKER AND BERNICE WALKER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 84875. Filed February 21, 1962.

---

[19] The Alabama law as applied in *Patterson* v. *Sims*, 281 F. 2d 577 (C.A. 5, 1960), is identical.

*Z. Simpson Cox, Esq.*, for the petitioners.
*Alfred L. Margolis, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined a deficiency in income tax against the petitioners for the calendar year 1955 in the amount of $521; and also an addition to tax under section 6651(a) of the 1954 Code, in the amount of $130.25, because of the petitioners' delay in filing a return for said year.

The issues to be decided are:

(1) Where a "noncompetent" American Indian, who was born on and lived on an Indian reservation and acted as the elected treasurer of the tribal community, received by reason of his services as such treasurer, a distribution or payment of $4,200 out of the Government-trusteed tribal funds derived directly from the tribal lands of the reservation, did the amount so distributed or paid to said Indian constitute taxable income under the Internal Revenue Code of 1954?

(2) Should an addition to tax be imposed for the delay of said Indian and his wife in the filing of an income tax return, solely with respect to the amount so distributed or paid?

### FINDINGS OF FACT.

The petitioners, Freeman P. Walker (hereinafter called Walker) and Bernice Walker, are husband and wife. They are full-blooded American Indians who were born on, and now live on, the Gila River Indian Reservation near Tucson, Arizona. They are so-called "noncompetent" Indians, because a "certificate of competency" has not been issued to either of them by the Secretary of the Interior of the United States.

The Gila River Indian Reservation includes approximately 371,000 acres of land, located on the Gila River in southwestern Arizona; and more than 5,000 Indians live thereon. Title to all the lands of the reservation is in the United States, which holds the same in trust for the use and benefit of the Indians living thereon. Most of such Indians belong to the Pima Tribe; but others belong to the Maricopa Tribe which is a smaller group. In the operation and administration of the reservation, these two tribes are regarded as a single unit; and accordingly, the term "tribe" as hereinafter used, has reference to both groups as though they were members of a single tribe.

The lands comprising the Gila River Indian Reservation are of two classes: (1) Portions of the lands from which small plots of 10 or more acres have been set aside and made the subject of restricted "allotments" for the use and occupancy of individual Indians; and (2) so-called "tribal lands" which have not been allotted to particular Indians, but which are held by the Government for the use and

benefit of the tribe as a whole. Of the 371,000 acres comprising the reservation, about 27 percent thereof was "allotted" land; and the remaining 73 percent thereof was included in the so-called "tribal lands." In the instant case, we are concerned only with funds which had their source in receipts and revenues that the tribe as a whole derived directly from said "tribal lands," and which the Government thereafter held in trust for the use and benefit of the tribe.

The principal activity of most of the Indians on the reservation was farming. Those Indians who had been "allotted" particular parcels, usually worked on such parcels if they were irrigable; and most of the other Indians who either had no allotted parcels or whose parcels were arid, worked on the common "tribal lands," where they raised cotton, barley, and other crops.

Ultimate control over the management and operation of the reservation was vested in the Secretary of the Interior; and prior to 1938, these functions were handled directly by agents and representatives of the Bureau of Indian Affairs of the Interior Department. In 1934 however, Congress enacted the so-called Wheeler-Howard Act (Act of June 18, 1934, 48 Stat. 984, 25 U.S.C. 461 *et seq.*), which made provision for the organization of Indians residing on reservations, into membership corporations operating under charters to be issued by the Secretary of the Interior, in order—

to enable tribes and tribal members to become self-sufficient by their own efforts in lines of endeavor congenial to native tastes and talents, and to make possible the transfer to the organized tribes of responsibility for services hitherto performed by the Federal Government.[1]

In 1936 the Indians residing on the Gila River Indian Reservation, acting pursuant to the provisions of the Wheeler-Howard Act, organized themselves into a tribal community, and adopted a proposed constitution and proposed bylaws. Thereafter in 1937, the Secretary of the Interior (after having approved such organizational steps) issued to such Indians a charter for a community corporation, under the name of "The Gila River Pima-Maricopa Indian Community of the Gila River Reservation." Such charter was to become effective upon ratification by a majority vote of the adult Indians living on the reservation. This ratification was effected in 1938; and at all times since, said tribal community has been operated by the Indians as a means toward their attaining the above-mentioned objectives of the Wheeler-Howard Act.

[1] The above quotation is from an official publication of the United States Department of Interior, entitled "Federal Indian Law," p. 270 (1958). See also other references in said volume, to the above-mentioned Wheeler-Howard Act, on pages 128–131.

Said publication is a revision and updating of the Handbook of Federal Indian Law (1940) prepared under the supervision and editorial direction of the late Felix S. Cohen, which was cited by the Supreme Court in *Squire* v. *Capoeman*, 351 U.S. 1, 8–9, and footnote 15 thereof.

In the operation of said tribal community, the Gila River Reservation was divided into 7 voting districts. The Indians residing in these districts elected a total of 17 representatives who served as members of the community council; and these council members, in turn, elected the officers of the community who included a governor, a lieutenant governor, a secretary, and a treasurer. Such council members and officers thereafter exercised many of the functions of administering the reservation, which had prior to the organization of the community been exercised directly by officials of the Bureau of Indian Affairs.

Following the organization and incorporation of said tribal community, title to all reservation lands (both tribal and allotted) continued as before to be in the United States Government which held the same in trust for the use and advancement of the Indian residents. And, as regards the so-called tribal lands which were used by the Indians in common, substantially all the receipts and revenues produced therefrom were, after the creation of the community as before, covered into the United States Treasury where they were held in trust for subsequent appropriation and disbursement for the benefit of the Indians on the reservation. The community council and officers were, however, given a large measure of responsibility for deciding and recommending how such receipts and revenues from the tribal lands should be disbursed and used.

During the year 1955, the amount of the receipts and revenues derived from the tribal lands on the Gila Indian Reservation—all of which were devoted to the use and benefit of the members of the tribe— was approximately $340,000. This amount consisted principally of proceeds from sales of cotton and barley grown by the Indians on said tribal lands; but it included also smaller amounts received from leases to non-Indian farmers, and from such other miscellaneous sources as fees from the granting of rights-of-way for telephone lines, buslines, and pipelines. None of such receipts and revenues arose from reinvestments of the amounts derived directly from the land, except one small item representing repayment with 3-percent interest of a $35 loan made to an Indian student. Of said total revenues of $340,000 for 1955, all except about $17,000 was covered into the United States Treasury for retention in trust until such time as the same was withdrawn for tribal use. As regards the $17,000, this represented an amount which the Secretary of the Interior permitted the tribe to hold in a tribal bank account for its miscellaneous use.

The evidence herein shows that all of the above-mentioned receipts and revenues from the tribal lands were used for the benefit of the tribe; but it does not show precisely how such funds were employed, except that cash distributions or payments were made to the com-

munity officers, to the farm manager, and to certain of the tribal members who performed labor as irrigators and cotton choppers. The amount of cash so distributed or paid to petitioner Walker in connection with his services as the elected treasurer of the tribal community, was $4,200. The community charter forbade the making of per capita distributions from the tribal funds to the tribal members.

From the time of the organization and incorporation of the community in 1938 until after the close of the year 1955 which is here involved, none of the tribal members or officers filed any income tax return or paid any income tax with respect to the cash distributions or payments out of the tribal funds which they received as above mentioned. Also, during this same period, no withholdings for income tax with respect to such tribal members and officials were made by the representatives of the Interior Department or the community officials, who handled the disbursements of the tribal funds.

In the spring of 1958, an internal revenue agent came to Walker's office on the reservation, and told Walker that he was subject to income tax on the above-mentioned $4,200 which had been distributed or paid to him in 1955 out of the tribal funds. The agent then presented Walker with a form of income tax return which the agent had prepared, on which the above-mentioned $4,200 was classified as "wages," and shown as the only item of gross income. The amount of the tax computed on this return was $521; and to this was added a "penalty" of $130.25, and also interest to June 15, 1958, of $70.42—making a total computed liability of $721.67.

Walker informed the revenue agent that he was unwilling to execute the proposed return until he had an opportunity to confer with the tribal attorney. Thereafter Walker consulted with such attorney; and the latter expressed his opinion that the $4,200 in question was not subject to income tax. The attorney did, however, prepare a return for Walker and his wife covering the year 1955, on which no tax was shown to be due, but which set forth the following statement with respect to the above-mentioned $4,200:

| | Wages, etc. | Income tax withheld |
|---|---|---|
| Exempt income from lands in Trust with U.S.A.—Gila River Pima-Maricopa Indian Community | $4,200.00 | None | None |

Walker and his wife then executed this return, and filed the same on May 29, 1958, with the director of internal revenue for the district of Arizona.

The respondent, in his notice of deficiency herein, determined the above-mentioned deficiency in income tax on the ground that said $4,200 constituted "wages" received by Walker as an "employee" of the "Community Council"; and he also determined the above-mentioned addition to tax because of the late filing of the return.

OPINION.

The respondent urges us to view this as an ordinary tax case. His position is in substance: That Walker received the $4,200 in question as "wages" while working as "an employee" of the Gila River Pima-Maricopa Community; that under section 61(a) of the 1954 Code, wages of an employee are reportable and includible in gross income; and that no provision of the Code affords an exemption from income tax to an American Indian.

Such position of the respondent would be valid if the premises upon which it rests were correct; for in *Squire* v. *Capoeman*, 351 U.S. 1, 6 (1956), the Supreme Court said: "We agree \* \* \* that Indians are citizens and that in *ordinary affairs of life*, not governed by treaties or *remedial legislation*, they are subject to the payment of income taxes as are other citizens." (Emphasis supplied.) We think, however, that the premises upon which the respondent's position is predicated are not correct, in that Walker was not an "employee" of the tribal community or its council; and that the $4,200 which was distributed or paid to him out of the trusteed tribal funds was not "wages" of a type which Congress intended to be included within the scope of section 61(a) of the Code. We believe also that Walker, who was a *noncompetent* Indian living on the Indian reservation as a ward of the Government, did not receive said amount "in [the] ordinary affairs of life"; and also that he did not receive the same free from the impact of "remedial legislation."

## *I.*

The policy of our Government toward the Indian, and more particularly toward Indians living on Indian reservations, has been gradually and carefully developed by Congress over a period of many years; and it is reflected in treaties, statutes, and numerous court decisions, as well as in departmental rules and regulations not inconsistent therewith.[2]

Indians have always been treated as wards of the Government (*United States* v. *Kagama*, 118 U.S. 375; *La Motte* v. *United States*, 254 U.S. 570; *Squire* v. *Capoeman, supra*); and in more recent years, the emphasis has been to provide Indians living on reservations with a greater degree of self-government and economic independence, so

---

[2] See in this connection, the following landmark statutes: (1) The Act of June 30, 1834, providing for the organization of the Department of Indian Affairs, 4 Stat. 735; (2) the General Allotment Act of February 8, 1887, 24 Stat. 388, which provided for the restricted allotment of land to individual Indians, under an arrangement whereby title would be held in trust by the Government for eventual release to the Indian allottees; and (3) the Act of June 18, 1934 (Wheeler-Howard Act), 48 Stat. 984, 25 U.S.C. 461 *et seq.*, which provided, among other things, for the organization of tribes residing on reservations, into incorporated tribal communities. See also the review of such legislation and court decisions in Federal Indian Law cited at footnote 1, *supra*.

as better to prepare them "to take their place as independent, qualified members of the modern body politic." *Board of Commissioners* v. *Seber*, 318 U.S. 705, 715. The guardian-ward relationship and the responsibility of the Government for the Indians' welfare, are creatures of Congress; and it rests entirely with Congress to determine when such relationship and responsibility shall cease. *Tiger* v. *Western Investment Co.*, 221 U.S. 286, 315.

One of the concerns of Congress in giving effect to the above-mentioned guardian-ward relationship was to protect its Indian wards from the impact of State and local taxation during the trust period. Accordingly, when Congress enacted Federal income tax statutes following the adoption of the 16th amendment, a question arose as to whether Congress intended that such revenue statutes should be applicable to tribal Indians with respect to whom the guardian-ward relationship existed.

On March 20, 1925, the Attorney General of the United States rendered an opinion (34 Op. Atty. Gen. 439 (1925)) which, though it dealt in large part with facts and questions different from those in the instant case, included the following statements which are here pertinent:

This practice of safeguarding the Indian has been continuously adhered to. * * * It is well established that general Acts of Congress do not apply to Indians unless so worded as clearly to manifest an intention to include Indians in their operation. (*Elk* v. *Wilkins*, 112 U.S., 94.) The Indian has always been the object of special legislation. Never has it been the practice to legislate for him generally along with the rest of the people.

The foregoing rule governing the construction of treaties and statutes affecting the Indians is in a measure applicable to revenue statutes. * * *

True, the Federal income tax statutes are in broad compass and impose a tax upon the entire net income of "every individual." * * * No specific reference, however, is made in these Acts to Indians and their property. * * * At any rate, I am unable, by implication, to impute to Congress under the broad language of our internal revenue Acts an intent to impose a tax for the benefit of the Federal Government on income derived from the restricted property of these wards of the Nation—property the management and control of which rests largely in the hands of officers of the Government charged by law with the responsibility and duty of protecting the interests and welfare of these dependent people. In other words, it is not lightly to be assumed that Congress intended to tax the ward for the benefit of the guardian.

Therefore, in the absence of clear congressional authority to that effect, I am of opinion that the income from the restricted lands of the Quapaw Indians is not subject to the Federal income tax laws.

This opinion of the Attorney General was published by the Treasury Department, as T.D. 3754, IV-2 C.B. 37 (1925). And during the following 10 years, while said opinion and said Treasury decision continued in force, Congress enacted four revenue acts relating to income taxes, without including any specific reference therein to the taxation of Indians (Revenue Acts of 1926, 1928, 1932, and 1934).

Also, during this same period, Congress enacted the landmark Act of June 18, 1934, known as the Wheeler-Howard Act, under which its program of helping the noncompetent Indian to become more self-sufficient was further advanced by organizing reservation Indians into incorporated tribal communities. In this Act also, no specific reference was made to income taxation of the tribal members of such communities.

Subsequently in 1935, the Supreme Court decided the case of *Superintendent* v. *Commissioner*, 295 U.S. 418; and it therein held that income derived from the "investment" of funds arising from restricted lands allotted to a Creek Indian, which were in excess of that Indian's needs, was subject to Federal income tax. This decision, notwithstanding that it related only to "reinvestment income," appeared to reflect a policy of stricter construction in applying revenue laws to Indians; and about 2½ years after the case was decided, the Attorney General advised the Secretary of the Interior by letter (39 Op. Atty. Gen. 107), that "The decision of the Supreme Court in *Superintendent* v. *Commissioner*, * * * must prevail over the contrary conclusion reached in the Attorney General's opinion of March 20, 1925 (34 Op. Atty. Gen. 439), regarding the taxability of income from restricted lands of the Quapaw Indians." These developments did not however, as is hereinafter shown, put an end to the basic problem of whether Congress intended the revenue laws to be applicable to income derived *directly* from Government-owned reservation lands, and used in furthering the purposes of the Government's guardian and ward relationship. All subsequently enacted revenue acts and also the 1939 and 1954 Codes, like their predecessors, continued to make no specific reference to income taxation of Indians.

Thereafter in 1956, the Supreme Court decided the Indian case of *Squire* v. *Capoeman*, *supra*. This case involved the question of whether proceeds from the sale of standing timber on a parcel of reservation land that had been "allotted" to a noncompetent Indian resident of the reservation, was subject to Federal income taxation as capital gain. The Supreme Court answered this question in the negative; and thereby affirmed the similar decisions below of the Court of Appeals for the Ninth Circuit (220 F. 2d 349) and of the District Court (110 F. Supp. 924). Although the Supreme Court based its opinion in large part on its interpretation of one of the sections of the General Allotment Act of 1887, it also emphasized the guardian-ward relationship existing between the United States and noncompetent Indians; referred to the Government's efforts to enable such Indians to become self-sufficient; and pointed out the unreasonableness of inferring that Congress, in enacting the income tax laws, intended "to limit or undermine the Government's undertaking." The Interior Department's publica-

tion, Federal Indian Law (1958),[3] states at page 882: "In *Squire* v. *Capoeman* \* \* \* the Supreme Court reverted to a policy of liberal construction in applying revenue laws to Indians."

A summary of portions of the *Capoeman* opinion, which appear to have a bearing on the controversy in the instant case, is as follows:

The Supreme Court rejected the Government's contention that said case should be viewed as an "ordinary tax case," without regard to such matters as the long-standing congressional policy concerning Indians, and the guardian-ward relationship existing between the United States and the Indians. It stated that, although the provision of the General Allotment Act there considered, was "not expressly couched in terms of nontaxability," the Court had theretofore held that, "Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith."

The Court quoted from the above-mentioned opinion of the Attorney General, of March 20, 1925, in which the Attorney General had advised that he was—

unable, by implication, to impute to Congress under the broad language of our Internal Revenue Acts an intent to impose a tax for the benefit of the Federal Government on income derived from the restricted property of these wards of the nation; property the management and control of which rests largely in the hands of officers of the Government charged by law with the responsibility and duty of protecting the dependent people.

It also quoted the statement of Felix S. Cohen, an expert on Indian law, which was set forth in the 1940 edition of the Interior Department's handbook on Indian law, that: "It is clear that the exemption accorded *tribal and restricted Indian lands* extends to the income derived therefrom. [Emphasis supplied.]" The Court then stated: "These relatively contemporaneous official and unofficial writings [of the Attorney General and of Cohen] are entitled to consideration."

The Court noted that the above-mentioned opinion of the Attorney General had been "overruled" on authority of the Court's prior decision in *Superintendent* v. *Commissioner, supra;* and it thereupon stated that the *Superintendent* case was distinguishable, in that it involved only income which had been derived from "investment of surplus income," which it was not necessary to exempt from tax burdens.

The Court distinguished also, at footnote 19 of its opinion, the case of *Choteau* v. *Burnet*, 283 U.S. 691, by stating that its holding therein pertained only to a *competent* Indian, who had *unrestricted* control over lands and the income therefrom, and who was not exempt from income tax solely because of his status as an Indian.

---

[3] See footnote 1, *supra.*

Finally, the Court spoke of the wisdom of the congressional exemption from tax (impliedly) embodied in the General Allotment Act which reflected the Government's purpose "of bringing * * * [the noncompetent Indian] finally to a state of competency and independence," and of enabling him to "go forward when declared competent with the necessary chance of economic survival in competition with others." The Court then stated:

It is unreasonable to infer that, in enacting the income tax law, Congress intended to limit or undermine the Government's undertaking. To tax respondent under these circumstances would, in the words of the court below [the Court of Appeals for the Ninth Circuit], be "at the least, a sorry breach of faith with these Indians."

## II.

Turning now to the instant case, we are convinced, as heretofore stated, that this is not an ordinary tax case involving the "wages" of an "employed" citizen. Rather, we are here concerned with the operation of a Government program, gradually and carefully developed over a period of many years, to advance the noncompetent reservation Indian to a point where he may become a competent member of our body politic. The petitioner was one of the participants in this program; and his part was to serve his people as the elected treasurer of their tribal community. Congress, through its enactment of the Wheeler-Howard Act, had made provision for the creation of such tribal communities, as another step in preparing the noncompetent Indian for self-government.

The relationship between the community council and Walker was not that of master and servant, or employer and employee. The community council did not own the tribal funds out of which Walker was paid—these were funds which the Government held in trust for its Indian wards; and also, the community council did not own the tribal lands from which these funds were derived—for all these lands were owned by the Government and were likewise held by it in trust for the benefit of its wards. In addition, the services performed by Walker as treasurer of the tribal community—like the services performed by other tribal Indians who tilled the reservation soil—were not for the benefit of the Government, as a master or employer; but rather they were for the benefit of the worker and his people, in furthering the Government's training program for noncompetent Indians. All of this is different from the employment of fully *competent* persons who are not *beneficiaries* of the Government's undertaking, and whom it is not necessary to protect from tax burdens.

The amount paid to Walker was in reality a distribution to him, as one of the beneficiaries of the trusteed tribal funds which the Government held for the use of him and the other members of his

tribe. And the mere fact that such amount was fixed by reference to his services as community treasurer, does not warrant a characterization of the same as "wages," within the meaning of the Internal Revenue Code. For we are convinced that, although the distribution was a benefit conferred by the Government, the Government's policy was not to put the Indian in the position of taking a "hand-out" of alms; but it was instead, to have the Indian perform some type of service for his tribe, which would instill in him that self-respect and self-confidence which are hallmarks of a good citizen.

The respondent himself has now recognized, that at least some of the officials of tribal communities are not "employees" working for "wages," within the meaning of several Federal statutes. As recently as 1959, the Internal Revenue Service published a ruling (Rev. Rul. 59-354, 1959-2 C.B. 24), in which it made the following statement:

A review of many court decisions and legislative enactments pertaining to Indian tribes indicates that the powers vested in any tribe or tribal council by existing law, within the meaning of section 16 of the Wheeler-Howard Act, 25 U.S.C. 476, *precludes a conclusion that services performed by members of such councils in their capacities as council members constitute employment* for Federal employment tax purposes. Accordingly, it is held that the amounts paid to members of tribal councils for services performed by them as council members *do not constitute "wages"* for purposes of the Federal Insurance Contributions Act, Federal Unemployment Tax Act and the collection of *income tax at source on wages* (chapters 21, 23 and 24, respectively, Subtitle C, Internal Revenue Code of 1954). [Emphasis supplied.]

Although the ruling further states, without citation of any authority, that "wages" of "salaried employees" of tribal councils are subject to different treatment, we can conceive of no logical reason for treating tribal councilmen differently from tribal officers.

Bearing in mind the Government's historic and carefully developed undertaking to advance the training and competency of its Indian wards, and also keeping in mind the established principle that general Acts of Congress do not apply to Indians unless so worded as to clearly manifest an intention to include Indians in their operation— we regard the statement of the Supreme Court in *Squire* v. *Capoeman, supra,* to be here apposite: "It is unreasonable to infer that, in enacting the income tax law, Congress intended to limit or undermine the Government's undertaking."

We decide the first issue in favor of the petitioners.

### III.

Our holding with respect to the first issue serves to dispose also of the second issue. Since we have held that the distribution which Walker received was not taxable income, and since neither he nor his wife had any other income for which a return was required to

be filed, no sanction may properly be imposed under section 6651(a) for their failure to file a timely return. We think it appropriate to add that, in the situation here present, the petitioners' delay in filing a return was "due to reasonable cause and not due to willful neglect." Indeed, if their cause was not "reasonable," then such term is without significance.

*Decision will be entered for the petitioners.*