ROY D. EARL AND RUTH E. EARL, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17937–80.     Filed June 15, 1982.

Roy D. Earl, pro se.
*Thomas N. Tomashek*, for the respondent.

## OPINION

FEATHERSTON, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax:

| Year | Deficiency | *Sec. 6653(a),* *I.R.C. 1954, addition* |
|------|-----------|------------------------------|
| 1976 | $526 | $26 |
| 1977 | 161 | 8 |

The issues for decision are as follows:

(1) Whether petitioner Roy D. Earl, a Puyallup Indian, is taxable on compensation, consisting of a share of the proceeds of the sale of a fishing vessel's catch of fish, which he received for services performed as a crew member on the vessel; and

(2) Whether any part of the underpayment of tax for the years in issue was due to negligence or intentional disregard of the rules within the meaning of section 6653(a).[1]

All the facts are stipulated.

At the time the petition was filed, petitioners Roy D. Earl and Ruth E. Earl were legal residents of Gig Harbor, Wash. They filed joint Federal income tax returns for 1976 and 1977 with the Ogden Service Center, Ogden, Utah. The issues to be decided involve the activities of Roy D. Earl (petitioner), a

---

[1]All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

Puyallup Indian, who worked as a crewmember on a fishing vessel during those years.

At all times pertinent to this case, petitioner was recognized by the Tribal Council of the Puyallup Tribe as a Puyallup Indian, eligible to exercise the rights reserved under the Treaty of Medicine Creek of 1854, 10 Stat. 1132. The controversy to be resolved is whether that treaty, as interpreted by the courts, grants petitioner an exemption from Federal income taxes on his fishing income.

During the periods July 1, 1976, through October 27, 1976, and June 1, 1977, through September 6, 1977, petitioner was employed as a crewmember on *The Veteran*, a 65-foot purse seine vessel owned by Whitney-Fidalgo Seafoods, Inc. (Whitney-Fidalgo). Petitioner served as the cook on the vessel, and his duties included buying groceries and preparing meals for the crew. He also assisted the crew in handling the block, which is part of the mechanism used to pick up the fishing gear.

During the 1976 and 1977 fishing seasons, *The Veteran* had crews of six and eight men, respectively, including petitioner and the captain. Petitioner was the only Indian crewmember. The captain each year was Jack D. Bujacich, Jr., who was hired by Whitney-Fidalgo to operate the vessel. Bujacich's duties included hiring the crew.

*The Veteran* fished waters in the area of the San Juan Islands north of Puget Sound. This is one of the "usual and accustomed" fishing grounds of the Puyallup Tribe of Indians referred to in the Treaty of Medicine Creek of 1854 as interpreted by the courts. *The Veteran's* catch was limited to various types of salmon, and all of the catch was sold to Whitney-Fidalgo at the same price that it paid for fish from vessels not owned by the company. The proceeds of the catch were shared by Whitney-Fidalgo and the crew. As owner of the vessel, Whitney-Fidalgo received three "shares." The captain received two shares, and crewmembers each received one share, reduced by a daily rate for fuel and food.

Neither petitioner nor the other crewmembers received any compensation in the form of salmon or other fish. At the end of the fishing season in 1976 and 1977, the captain and each crewmember received a check from Whitney-Fidalgo for his share of the income based on the sale of the salmon catch.

Whitney-Fidalgo issued to petitioner a Form W–2 and an amended Form W–2 for the 1976 payment and a Form 1099 for the 1977 payment. His share was $1,542 in 1976 and $2,035 in 1977.

Salmon fishing in the State of Washington is regulated by the Washington State Department of Fisheries, subject to the limitations set forth in the Treaty of Medicine Creek and other treaties as interpreted by *United States v. State of Washington*, 384 F. Supp. 312 (W.D. Wash. 1974), affd. 520 F.2d 676 (9th Cir. 1975). Broadly stated, that case interpreted the Treaty of Medicine Creek to allocate the fish to be harvested from the "usual and accustomed" fishing grounds equally between Indians and non-Indians. For purposes of allocating salmon between Indian and non-Indian fishermen, *The Veteran* was classified by the Department of Fisheries as non-Indian because it was owned by Whitney-Fidalgo and not by Indians.[2]

Petitioner relies on section 3121(b)(20),[3] which was added to the Code in 1976. That section provides in general terms that

---

[2]Because *The Veteran* was classified by the Department of Fisheries as a non-Indian vessel, despite petitioner's participation as a crewmember, its catch was presumably chargeable to non-Indians and not even in part to the Puyallup Tribe.

[3]SEC. 3121. DEFINITIONS.

(b) EMPLOYMENT.—For purposes of this chapter, the term "employment" means any service, of whatever nature, performed either (A) by an employee for the person employing him, irrespective of the citizenship or residence of either, (i) within the United States, or (ii) on or in connection with an American vessel or American aircraft under a contract of service which is entered into within the United States or during the performance of which and while the employee is employed on the vessel or aircraft it touches at a port in the United States, if the employee is employed on and in connection with such vessel or aircraft when outside the United States, or (B) outside the United States by a citizen of the United States as an employee for an American employer (as defined in subsection (h)); except that such term shall not include—

*     *     *     *     *     *     *

(20) service performed by an individual on a boat engaged in catching fish or other forms of aquatic animal life under an arrangement with the owner or operator of such boat pursuant to which—

    (A) such individual does not receive any cash remuneration (other than as provided in subparagraph (B)),

    (B) such individual receives a share of the boat's (or the boats' in the case of a fishing operation involving more than one boat) catch of fish or other forms of aquatic animal life or a share of the proceeds from the sale of such catch, and

    (C) the amount of such individual's share depends on the amount of the boat's (or the boats' in the case of a fishing operation involving more than one boat) catch of fish or other forms of aquatic animal life,

but only if the operating crew of such boat (or each boat from which the individual receives a share in the case of a fishing operation involving more than one boat) is normally made up of fewer than 10 individuals.

crewmembers of a fishing boat, with a crew of less than 10 members, who are compensated with a share of the boat's catch or a share of the proceeds of the sale of such catch, are classified as self-employed. As a self-employed individual engaged in fishing in the usual and accustomed fishing grounds of the Puyallup Indians, petitioner argues, he is exempt from taxes under the Treaty of Medicine Creek of 1854. That treaty, he contends, makes the fishing waters off the reservation an extension of the reservation land, and fishing involves merely a harvesting of the raw and natural resources of the reservation. Petitioner maintains that income from such fishing is analogous to income from the cutting of timber from allotted lands which in *Squire v. Capoeman*, 351 U.S. 1 (1956), was held to be nontaxable. We disagree.

Sections 1 and 61 broadly provide that the income of every individual, from whatever source derived, is subject to Federal income tax. The income of Indians, as well as other individuals, is taxable "unless an exemption from taxation can be found in the language of a Treaty or Act of Congress." *Commissioner v. Walker*, 326 F.2d 261, 263 (9th Cir. 1964), affg. in part and revg. in part 37 T.C. 962 (1962), and cases cited therein; *Jourdain v. Commissioner*, 71 T.C. 980, 987 (1979), affd. per curiam 617 F.2d 507 (8th Cir. 1980). We can hold for petitioner only if we can find "express exemptive language in some statute or treaty." *United States v. Anderson*, 625 F.2d 910, 913 (9th Cir. 1980).

The Treaty of Medicine Creek of 1854 contains no language exempting income from taxation. Article 3 of that treaty, on which petitioner relies, states that "the right of taking fish, at all usual and accustomed grounds and stations, is * * * secured to * * * Indians [of the Puyallup Tribe] in common with all citizens of the Territory." As noted above, this provision was interpreted in *United States v. State of Washington*, 384 F. Supp. at 343, to mean that the Indians covered by the treaty were entitled to share equally with non-Indians the fish taken from such "grounds and stations." That is, the Indians were to have the opportunity to take up to 50 percent of the harvestable number of fish that may be taken by all fishermen at the usual and accustomed grounds and stations. But article 3 contains nothing dealing with the taxation of income derived from such fishing. We conclude, therefore, that

under the principles of the above-cited cases, the income derived from exercising fishing rights guaranteed by the treaty is taxable.

In principle, assuming that the Puyallup Tribe's usual and accustomed fishing waters, as contended by petitioner, may be regarded as an extension of the reservation, the issue here is the same as in *Strom v. Commissioner*, 6 T.C. 621 (1946), affd. per curiam 158 F.2d 520 (9th Cir. 1947). In that case, the taxpayer, a Quinaielt Indian, relied upon the treaty between the United States and the Quinaielt and certain other Indian tribes dated July 1, 1855. The treaty guaranteed, among other things, the rights of the Quinaielt to fish the rivers *within* the reservation. Rejecting an argument that this guarantee exempted fishing income from Federal income taxation, this Court said (6 T.C. at 627):

> There is here no express exemption from tax in the treaty with the Quinaielt Indian Tribe. The income which respondent seeks to tax is in the "untrammeled possession" of the petitioners, with no restriction upon its use by them. We do not agree with the argument that the imposition of the tax upon income earned by these petitioners in carrying on a commercial fishing business on the Quinaielt River is a restriction upon the *right* to fish guaranteed by the treaty. The Quinaielt Indians on the reservation were as free to fish in the Quinaielt River after the imposition of an income tax as they were prior to that time. The disputed income tax is not a burden upon the *right to fish*, but upon the income earned through the exercise of that right.

The holding in *Squire v. Capoeman, supra,* does not aid petitioner's cause. In that case the Supreme Court found an exemption from Federal income taxation for noncompetent Indians[4] in the General Allotment Act of 1887, ch. 119, 24 Stat. 388, 25 U.S.C. sec. 331 et seq. Under that act, the allotted land was to be held in trust by the United States for the "sole use and benefit" of the Indian allottee, subject to a promise to convey the fee interest to the allottee at the end of the trust "free of all charge or incumbrance whatsoever." 25 U.S.C. sec. 348. Finding a congressional intent to exempt allotted land from all taxes until the fee interest was transferred to the

---

[4]The term "noncompetent Indian," as used in cases such as the instant one, refers to one who has been allotted land that is held in trust for him by the United States and who, therefore, may not alienate or encumber that land without the consent of the United States. The term does not denote mental incapacity.

allottee (351 U.S. at 8), the Supreme Court held that income derived directly from an Indian's own trust allotment was exempt from income tax. Specifically, it held that the Federal income tax did not apply to income received by noncompetent Quinaielt Indians from the sale of standing timber on lands allotted to them from the Quinaielt Reservation (351 U.S. at 9–10). The "income which was held to be exempt to the allottee was from operations conducted *on his own allotted land." Fry v. United States*, 557 F.2d 646, 648 (9th Cir. 1977).

Clearly, the *Capoeman* reasoning does not apply here, because petitioner has no individual fishing rights analogous to an allotment under the General Allotment Act of 1887, *supra*. In *United States v. State of Washington*, 520 F.2d at 688, the court described the rights conferred by the Treaty of Medicine Creek of 1854, and similar treaties, as follows:

Each tribe bargained as an entity for rights which were to be enjoyed communally. * * * Individual Indians had no individual title to property, but participated in the communal rights of the tribe. "The right of the individual Indian is, in effect, a right of participation similar in some respects to the rights of a stockholder in the property of a corporation." F. Cohen, Handbook of Federal Indian Law 183 (1942, reprinted 1971). The right to fish at usual and accustomed grounds was one such communal property right pertaining to the tribe. * * * To hold that the Indian negotiators intended to secure for each member of the tribe the right to compete for fish on equal terms as an individual with each individual settler * * * thus would be to disregard the fabric of Indian society at the time the treaties were concluded * * *

Thus, petitioner's fishing rights under the treaty as a member of the Puyallup Tribe are more comparable to his rights as a member of the tribe in unallotted land on the reservation than to individual rights in allotted land. Similarly, petitioner's income from the exercise of the tribe's communal fishing rights would be more analogous to income obtained from unallotted tribal land and not to income derived from allotted land, which was involved in *Squire v. Capoeman, supra*. In *Fry v. United States, supra*, the court held that a noncompetent Indian engaged in logging on tribal lands, as a subcontractor to a non-Indian company, was taxable on the income he realized. Similarly, in *United States v. Anderson, supra* at 913, the court held that income derived by a noncompetent Indian from cattle ranching under tribal licenses covering land held in trust by the United States for

other noncompetent Indians was taxable. To the same effect, see *Holt v. Commissioner*, 44 T.C. 686 (1965), affd. 364 F.2d 38 (8th Cir. 1966); *Stevens v. Commissioner*, 52 T.C. 330 (1969), revd. on other issues 452 F.2d 741 (9th Cir. 1971). Even assuming that petitioner was exercising his tribal rights while working on *The Veteran*, his income is taxable.

Petitioner cites *Rickert v. United States*, 188 U.S. 432 (1903), for the "fundamental principle of Indian tax law" that "the tax exemption of Indian trust land on a reservation applies equally to permanent improvements and personal property on the land because all are needed for the Indians to achieve the congressional purpose of using the land to earn a living." That case, however, involves the right of States to tax property on Indian reservations and is, therefore, inapposite. There is no question as to the right of Congress to levy an income tax on petitioner's income. See *Holt v. Commissioner*, 364 F.2d at 42.

There remains the issue as to the applicability of the addition to tax under section 6653(a).[5] That section applies if any part of an underpayment of tax is due to "negligence" or "intentional disregard of rules." It is stipulated that petitioner's exclusion of his share of the income from *The Veteran's* catch from his 1976 and 1977 tax returns was "based upon the determination of Whitney-Fidalgo that he was self-employed during 1976 and 1977 under I.R.C. sec. 3121(b)(20) and his understanding that other self-employed Indian fishermen were not reporting their income from fishing." The instant case was filed as a "small tax case" under section 7463. Respondent moved to have the case heard under the rules applicable to other cases, because of "the importance of the issue." In these circumstances, although we have held against petitioners, we are not prepared to say that their position is so completely lacking in merit as to warrant a finding that they were negligent or that they intentionally disregarded the applicable rules in taking that position.

---

[5]SEC. 6653. FAILURE TO PAY TAX.

(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—

IN GENERAL.—If any part of any underpayment * * * of any tax imposed by subtitle A, * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

To reflect the foregoing,

*Decision will be entered under Rule 155.*