ESTATE OF LUCILLE A. PETERSON, DECEASED, WILFRED M. PETERSON, ADMINISTRATOR, AND WILFRED M. PETERSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 44401-85.          Filed February 11, 1988.

*Joseph F. Preloznik,* for the petitioners.
*Ronald J. Long,* for the respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income tax:

| Year | Deficiency | Sec. 6653(a)(1) [1] | Additions to tax Sec. 6653(a)(2) |
|---|---|---|---|
| 1980 | $6,531 | $327 | - - - |
| 1981 | 40,527 | 2,026 | 50% of interest due on |
| 1982 | 16,192 | 810 | the underpayment |

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The sole issue for decision is whether Wilfred M. Peterson's (Mr. Peterson) income from commercial fishing is includable in gross income or is excluded under the terms of three treaties between the United States and the Lake Superior Chippewa Indians (the Chippewas) that were executed during the 19th century.

All of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Mr. Peterson was a resident of Bayfield, Wisconsin, at the time he filed the petition. He and his wife, Lucille A. Peterson, who died on October 11, 1982, timely filed joint Federal income tax returns for the years 1980, 1981, and 1982 with the Internal Revenue Service Center at Kansas City, Missouri.[2]

During the years in issue, Mr. Peterson was a member of the Red Cliff Band of Lake Superior Chippewa Indians. As such, he was eligible to exercise the rights reserved by the Chippewas in the treaties that they had made with the United States, including the Treaty of St. Peters of 1837 and the Treaties of LaPointe of October 4, 1842, and September 30, 1854 (the treaties).

During the years in issue, Mr. Peterson held a commercial fishing permit and a tribal fish marketing permit issued by the Red Cliff Band of the Lake Superior Chippewa Indian Tribe. He sold the fish he caught to various individuals and entities located outside the land protected by the treaties.

Section 1 imposes a tax on each individual's taxable income, defined in section 63 as gross income less deductions. Gross income includes all income from whatever source derived, including gross income derived from business. Sec. 61(a)(2). Indians "in the ordinary affairs of life, not governed by treaties or remedial legislation, * * * are subject to the payment of income taxes as are other citizens." *Squire v. Capoeman,* 351 U.S. 1, 6 (1956). For an Indian's income not to be subject to tax, there must be "express exemptive language in some statute or treaty." *United States v. Anderson,* 625 F.2d 610, 613 (9th Cir. 1980); *Earl v. Commissioner,* 78 T.C. 1014, 1017 (1982). Since there is no specific statutory exemption, Mr.

---

[2]We will refer to Mr. Peterson and the Estate of Lucille A. Peterson as petitioners.

Peterson's fishing income is includable in his gross income, unless it is exempt under the treaties.

The primary terms of the treaties are the land grants from the Chippewas to the United States. The treaties also reserve to the Chippewas the right to fish in the territory ceded by them.[3] The parties agree that among the fishing rights guaranteed by the treaties is the right to fish commercially. See *Lac Courte Oreilles Chippewa Indians v. Wisconsin,* 653 F. Supp. 1420, 1430 (W.D. Wis. 1987). The question before us is the scope of that protection. Petitioners contend that it includes the right to sell the fish without including the proceeds of the sale in gross income for Federal income tax. Respondent contends that the treaty does not contain the necessary specific exemption from taxation with the result that Mr. Peterson's income from fishing is taxable.

In interpreting the fishing-rights clauses in the treaties to determine if an exemption from taxation is stated therein, we must apply two general rules of construction: (1) Indian treaties are to be interpreted as the Indians would naturally have understood them, *Washington v. Fishing Vessel Association,* 443 U.S. 658, 676 (1979) (quoting *Jones v. Meehan,* 175 U.S. 1, 11 (1899)); and (2) ambiguities are to be resolved in the Indian's favor. *Winters v. United States,* 207 U.S. 564, 576-577 (1908). See generally F. Cohen, Handbook of Federal Indian Law 221-225 (1982 ed.).

While we agree with petitioners that, in a proper case, an exemption from taxation might be found in treaties reserv-

---

[3]Art. 5 of the Treaty of 1837 provides: "The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and the lakes included in the territory ceded, is guarantied [sic] to the Indians, during the pleasure of the President of the United States." Treaty of St. Peters of 1837, 7 Stat. 536, 537.

Art. II of the Treaty of LaPointe of 1842 provides:

"The Indians stipulate for the right of hunting on the ceded territory, with the other usual privileges of occupancy, until required to remove by the President of the United States, and that the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress. [Treaty of LaPointe of 1842, art. II, 7 Stat. 591, 592.]"

Art. 11 of the Treaty of 1854 provides in pertinent part that such Indians that "reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President." Treaty of LaPointe of 1854, art. 11, 10 Stat. 1109, 1111.

The hunting, fishing, and gathering rights contained in the treaties have never been terminated effectively by the President of the United States. *Lac Courte Oreilles Band v. Voight,* 700 F.2d 341 (7th Cir. 1983). The full texts of the treaties are reprinted as Appendix B to *United States v. Bouchard,* 464 F. Supp. 1316, 1364 (W.D. Wis. 1978).

ing rights to Indians (see *Squire v. Capoeman, supra*), we do not think that this is such a case. The Chippewas understood the fishing-rights provisions, along with the hunting- and gathering-rights provisions, as reserving in them rights to resources "sufficient to provide them with a moderate living." *Lac Courte Oreilles Chippewa Indians v. Wisconsin*, 653 F. Supp. at 1434. Given this understanding of the meaning of the fishing-rights provisions in the treaty, i.e., preservation of a means of livelihood, we cannot stretch the treaty language to provide petitioners with the necessary specific exemption from taxation. The fact that the taxes which petitioners may be required to pay on fishing income will diminish the amount of that income available for other purposes does not, in our opinion, impinge upon Mr. Peterson's right to earn "a moderate living" sufficiently to warrant the conclusion that such income should be exempt from Federal income taxation. *Strom v. Commissioner*, 6 T.C. 621 (1946), affd. per curiam 158 F.2d 520 (9th Cir. 1947).

In addition, the general rule that an Indian treaty does not grant an exemption from taxation unless the Indian claiming the exemption holds an individual right analogous to the rights held by Indians under the Allotment Acts (see *Earl v. Commissioner*, 78 T.C. 1014 (1982) (citing *Squire v. Capoeman, supra*)),[4] precludes us from holding for petitioners. Treaty fishing rights are generally deemed to be held by the tribe (see *Washington v. Fishing Vessel Association, supra* at 679; F. Cohen, *supra* at 451); and we think that that is true here. Cf. *Lac Courte Oreilles Chippewa Indians v. Wisconsin, supra.* Because Mr. Peterson was exercising a right that belongs to the tribe in general rather than allotted to him individually, we are unable to find an exemption from taxation in the treaty provision granting the right. *Earl v. Commissioner, supra* at 1019.

We are not impressed by petitioners' attempt to persuade us that *Strom v. Commissioner, supra,* and *Earl v. Commissioner, supra,* are without precedential value. Granted that particular elements of *Strom* have been judicially rejected,[5]

---

[4]See also *Satiacum v. Commissioner*, T.C. Memo. 1986-356.

[5]The Supreme Court has since held that the right to fish held by the taxpayer in *Strom* is a right to a share of the fish caught by all fishermen, not merely a right to attempt to catch fish, see *Washington v. Fishing Vessel Association*, 443 U.S. 658, 678 (1979), and that the

we think that the essential thrust of the decision in that case retains its vitality. See *Earl v. Commissioner, supra* at 1018. As far as *Earl* itself is concerned, we think that its reasoning as to the subjection of fishing income to the Federal income tax based on the distinction between tribal and individual rights to that income is clearly applicable herein despite the fact that a different treaty with different language was involved.

To reflect the foregoing,

*Decision will be entered for the respondent in the amounts agreed upon by the parties.*

---

protections in the treaty at issue in *Strom* extend to commercial fishing, see *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 398-399 (1968).