# Taxability of Indian Treaty Fishing Income

Various treaties between the United States and Indian tribes secure to the Indian signatories the "right of taking fish at all usual and accustomed grounds and stations." In determining whether income derived from the exercise of these fishing rights is subject to federal tax, the relevant analysis is that employed by the Supreme Court in *Squire* v. *Capoeman*, 351 U.S. 1 (1956). *Squire* held that Indians are subject to the payment of income taxes as are other citizens unless a tax exemption is "clearly expressed" in an applicable treaty or statute. *Squire* also held that in analyzing a particular treaty or statute applicable to Indians, ambiguous language should be construed in the Indians' favor. The Tax Court has properly resolved the inherent tension between these two canons of construction by concluding that income earned by Indians from the exercise of treaty fishing rights is subject to the federal income tax.

December 12, 1985

MEMORANDUM OPINION FOR THE SECRETARY OF THE INTERIOR

Your letter to the Attorney General regarding the taxability, under federal law, of income earned by certain Indian tribes from the exercise of commercial fishing rights guaranteed by treaty has been submitted to the Office of Legal Counsel for review. This review, which examines the different positions of the Department of the Interior (Interior) and the Internal Revenue Service (IRS) on this subject, is being undertaken pursuant to Executive Order No. 12146 (July 18, 1979), *reprinted in* 28 U.S.C. § 509 note, and 28 C.F.R. § 0.25, which authorize the Office of Legal Counsel, on behalf of the Attorney General, to resolve legal disputes between Executive Branch agencies.

In 1983, the Solicitor of Interior concluded that treaty language reserving fishing rights to Indian tribes precluded federal taxation of income derived from the exercise of those rights. The IRS does not share that view, and has attempted to collect income taxes on fishing income earned by tribal fishermen from commercial fishing operations.[1] A number of Indians who have received notices of deficiency from the IRS have filed petitions for redetermination in the Tax Court.[2]

As you note in your letter, the Department of Justice will need to resolve this issue in order to arrive at a uniform position of the United States, should the pending cases proceed to litigation handled by the Department. We have

---

[1] The IRS issued technical memoranda in 1983 adopting the position that members of the affected Indian tribes are subject to the federal income tax. The IRS has maintained that position in ongoing litigation in Tax Court. *See infra* note 2.

[2] We have received copies of pleadings on summary judgment motions filed in two of those proceedings, *Jefferson* v. *Commissioner*, No. 836–84, and *Greene* v. *Commissioner*, No. 15921–84.

therefore reviewed the dispute in that context. As set forth below, we believe that the position of the IRS represents the more reasonable and sound reading of the applicable Supreme Court precedent, and therefore can be maintained in litigation handled by this Department.

## I. Background

### A. *Interpretation of Treaty Fishing Rights*

The treaties at issue here were negotiated in the 1850s with Indian tribes living in what is now the State of Washington in order to extinguish the last group of conflicting claims to lands lying west of the Cascade Mountains and north of the Columbia River.[3] *See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661–62 (1979). In exchange for their interest in most of the territory, the Indians were given monetary payments and the "exclusive use" of relatively small tracts of land, as well as certain other rights, including the right to fish. *Id.* With immaterial variations, the treaties each provide:

> The right of taking fish at all usual and accustomed grounds and stations is secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing the same; together with the privilege of hunting, gathering roots and berries, and pasturing their horses on all open and unclaimed lands.

Treaty of Olympia, art. III, 12 Stat. 971, 972 (July 1, 1855/Jan. 25, 1856). The scope of the fishing rights secured by these treaties, and the extent to which a state may interfere with those rights, has been considered on a number of occasions by the Supreme Court. *See, e.g., United States v. Winans*, 198 U.S. 371 (1905); *Seufert Bros. v. United States*, 249 U.S. 194 (1919); *Tulee v. Washington*, 315 U.S. 681 (1942); *Puyallup Tribe v. Department of Game*, 391 U.S. 392 (1968) (*Puyallup I*); *Department of Game v. Puyallup Tribe*, 414 U.S. 44 (1973) (*Puyallup II*); *Puyallup Tribe v. Department of Game*, 433 U.S. 165 (1977) (*Puyallup III*); *Commercial Passenger Fishing*, 443 U.S. 658. The Court has recognized that the rights secured by the treaties include the right to fish for commercial, as well as subsistence, purposes, and that the fishing right was critically important to the Indians in their acceptance of the treaties.[4] The Court has specifically rejected the argument that the treaties guarantee to the

---

[3] We understand that the following treaties are applicable here: Treaty of Medicine Creek, 10 Stat. 1132 (Dec. 26, 1854); Treaty of Point Elliott, 12 Stat. 927 (Jan. 22, 1855); Treaty of Point No Point, 12 Stat. 933 (Jan. 26, 1855); Treaty of Neah Bay, 12 Stat. 939 (Jan. 31, 1855); Treaty with the Yakimas, 12 Stat. 951 (June 9, 1855); and Treaty of Olympia, 12 Stat. 971 (July 1, 1855/Jan. 25, 1856).

[4] *See Commercial Passenger Fishing*, 443 U.S. at 676 ("During the negotiations, the vital importance of the fish to the Indians was repeatedly emphasized by both sides, and the Governor's promises that the treaties would protect that source of food and commerce was crucial in obtaining the Indians' assent."); *see also id.* at 665–66 & n.7.

Indians only the opportunity to compete with nontreaty fishermen on an individual basis, finding instead that the treaties entitle the Indians to take a fair share of the available fish.[5] In reaching that conclusion, the Court has found it significant that the Indians reserved to themselves preexisting fishing rights, rather than obtaining rights from the government:

> Because the Indians had always exercised the right to meet their subsistence and commercial needs by taking fish from treaty area waters, they would be unlikely to perceive a "reservation" of that right as merely the chance, shared with millions of other citizens, occasionally to dip their nets into the territorial waters.

*Commercial Passenger Fishing*, 443 U.S. at 678–79.

The Court has defined an "equitable measure" of the treaty right to be a division of the harvestable portion of each run that passes through a "usual and accustomed" place into "approximately equal treaty and nontreaty shares." *Id.* at 685. The treaty share should be reduced, however, "if tribal needs may be satisfied by a lesser amount." *Id.* Drawing on cases involving Indian reserved water rights,[6] the Court stated:

> [T]he central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood — that is to say, a moderate living. Accordingly, while the maximum possible allocation to the Indians is fixed at 50%, the minimum is not; the latter will, upon proper submissions to the District Court, be modified in response to changing circumstances.

*Id.* at 686–87 (footnote omitted).

The Court has also made clear that a state cannot interfere with the exercise of the fishing right, other than nondiscriminatory regulations reasonable and necessary for conservation of the fish. Thus, a state may not grant a nontreaty fisherman rights to use a "fish wheel" — a device capable of catching fish by the ton and totally destroying a run of fish, thereby effectively excluding the Indians from the right to take fish at a "usual and accustomed place." *United States* v. *Winans*, 198 U.S. 371, 384 (1905). A state may not require Indians to

---

[5] In *Commercial Passenger Fishing*, the Court said:
But we think greater importance should be given to the Indians' likely understanding of the other words in the treaties and especially the reference to the "right of *taking* fish" — a right that had no special meaning at common law but that must have had obvious significance to the tribes relinquishing a portion of their pre-existing rights to the United States in return for this promise. . . . In this context, it makes sense to say that a party has a right to "take" — rather than merely the "opportunity" to try to catch — some of the large quantities of fish that will almost certainly be available at a given place at a given time.
*Id.* at 678; *see also id.* at 683; *Puyallup I*, 391 U.S. at 398; *Puyallup III*, 433 U.S. at 48–49.

[6] The Supreme Court has held that treaties reserving land for the use of Indians in the arid western states also reserve, by implication, rights to water sufficient to meet subsistence or other needs of the Indians reasonably within the contemplation of the parties at the time the treaties were negotiated. *See Winters* v. *United States*, 207 U.S. 564, 576 (1908); *see also Cappaert* v. *United States*, 426 U.S. 128 (1968).

obtain a fishing license as a prerequisite to exercise of their treaty rights, *Seufert Bros.* v. *United States*, 249 U.S. 194, 198 (1919), and must give Indians access across private lands, if necessary, in order to assure access to treaty fishing locations, *Tulee* v. *Washington*, 315 U.S. 668, 685 (1942). State regulations justified on the basis of conservation must be both reasonable and necessary, *Puyallup II*, 414 U.S. at 45, and cannot discriminate against exercise by the Indians of their fishing rights, *id.* at 48; *Puyallup I*, 391 U.S. at 398.

On the other hand, the Indians cannot rely on their treaty right to exclude others from access to certain fishing sites outside the reservation in order to deprive other citizens of the state of a "fair apportionment" of a particular run. *Commercial Passenger Fishing*, 443 U.S. at 683–84. In sum:

> Nontreaty fishermen may not rely on property law concepts, devices such as the fish wheel, license fees, or general regulations to deprive the Indians of a fair share of the relevant runs of . . . fish in the case area. Nor may treaty fishermen rely on their exclusive right of access to the reservations to destroy the rights of other "citizens of the Territory." Both sides have a right, secured by treaty, to take a fair share of the available fish. That, we think, is what the parties to the treaty intended when they secured to the Indians the right of taking fish in common with other citizens.

*Id.* at 684–85.

The analysis in these treaty fishing cases relies heavily on factual evidence about the understanding of the parties at the time the treaties were negotiated and the importance of the fishing rights to the Indians who signed the treaties. The Court, consistent with its approach in other cases involving construction of Indian treaties, gave "special meaning" to the rule that "it is the intention of the parties, and not solely that of the superior side, that must control any attempt to interpret the treaties," *id.* at 675, because of the circumstances of the negotiations:

> [This Court] has held that the United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side. "The treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians."

*Id.* at 675–76 (quoting *Jones* v. *Meehan*, 175 U.S. 1, 11 (1899)).

## B. Indian Tax Cases

None of the cases construing the scope of the fishing right guaranteed by treaty discuss whether the income derived from exercise of the right to take a

fair share of fish at "usual and accustomed places" is exempt from federal income taxation. The Supreme Court and the lower federal courts have, however, reviewed the taxability of income earned by Indians in other contexts. The leading case involving the authority of the federal government to tax Indian income is *Squire* v. *Capoeman*, 351 U.S. 1 (1956), in which the Supreme Court considered whether capital gains from the sale of standing timber on lands allotted to noncompetent Indians pursuant to the General Allotment Act of 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. § 331 *et seq.*), was subject to the federal income tax.[7]

The General Allotment Act was intended to begin a new era in federal Indian policy. By treaty, most Indians had been guaranteed exclusive use of reservation land. Under the General Allotment Act, tribal lands were to be divided and allotted to individual members of the tribe. The allotments were to be held in trust by the United States for twenty five years or longer, if the President deemed an extension desirable, and then to be transferred to the allottee discharged of government trusteeship. 25 U.S.C. §§ 347, 348.

The Court began its analysis in *Squire* with the principle, already established in prior cases,[8] that "Indians are citizens and . . . in ordinary affairs of life, not governed by treaties or remedial legislation, they are subject to the payment of income taxes as are other citizens." 351 U.S. at 5–6. The Court recognized, however, that applicable treaties or statutes could create tax exemptions, if such exemptions were "clearly expressed." *Id.* The Court found such an exemption in the language in § 5 of the General Allotment Act, which provided that lands on Indian reservations allotted to individual Indians and held in trust for them by the government shall ultimately be conveyed to them in fee simple discharged of the trust and "free of all charge or incumbrance whatsoever." 25 U.S.C. § 348.

The Court recognized that this statutory provision was not "expressly couched in terms of nontaxability," and in fact became effective prior to enactment of

---

[7] A noncompetent Indian is one who holds allotted lands only under a trust patent, and who may not dispose of his property without the approval of the Secretary of the Interior The term does not denote mental capacity.

[8] In *Choteau* v. *Burnet*, 283 U.S. 691 (1931), and *Superintendent of Five Civilized Tribes* v. *Commissioner*, 295 U.S. 418 (1935), the Supreme Court definitively rejected the argument that Indians are exempt from federal taxation merely because of their status, in the absence of treaty or statutory provisions to the contrary. In *Choteau*, the Court held taxable the petitioner's share of tribal income from oil and gas leases made by the tribe pursuant to statute, concluding that "[t]he intent to exclude [income from taxation] must be definitively expressed, where, as here, the general language of the Act laying the tax is broad enough to include the subject matter." 283 U.S. at 696 (citations omitted). In *Five Civilized Tribes*, the Court concluded that the proceeds from the investment of funds derived from a restricted allotment were subject to federal taxation *See* 295 U.S. at 420–21.

Both *Choteau* v *Burnet* and *Five Civilized Tribes* were distinguished by the Court in *Squire* v. *Capoeman* The Court noted that *Choteau* concerned the question whether an Indian was exempt from tax solely because of his status, and that the facts in *Choteau* fit within the terms of § 6 of the General Allotment Act, which contemplates taxation of income earned by a competent Indian who has unrestricted control over lands and income thereon. *Five Civilized Tribes* was distinguished on the ground that the income involved was "reinvestment income" or "income derived from investment of surplus income on land." The Court stated that it would not be necessary to exempt such income from taxation in order to fulfill the purposes of the General Allotment Act. *See Squire*, 351 U.S. at 9.

any federal income tax, but nonetheless concluded that the words "charge or incumbrance might well be sufficient to include taxation." 351 U.S. at 7. In reaching this conclusion, the Court relied on its earlier statements indicating that ambiguous language in treaties and statutes applicable to Indians should be interpreted favorably to the Indians:

> Doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith. Hence, in the words of Chief Justice Marshall, "The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense." *Worcester* v. *Georgia*, 32 U.S. (6 Pet.) 515, 582 (1832).

351 U.S. at 6–7 (quoting *Carpenter* v. *Shaw*, 280 U.S. 363, 367 (1930)).

The Court did not find it necessary, however, to rely solely on the language of § 5. It found "additional force" in § 6 of the General Allotment Act, 25 U.S.C. § 349, which authorizes the Secretary of the Interior to issue a patent in fee simple to any allottee competent to manage his own affairs. That section provided that "thereafter *all restrictions as to* sale, incumbrance, or *taxation* of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent" (emphasis added). The Court concluded:

> The literal language of the proviso evinces a congressional intent to subject an Indian allotment to all taxes only after a patent in fee is issued to the allottee. This, in turn, implies that, until such time as the patent is issued, the allotment shall be free from all taxes, both those in being and those which might in the future be enacted.

351 U.S. at 7–8.

The Court also found that its interpretation of the intent of § 5 was supported by several opinions of the Attorney General and unofficial writings "relatively contemporaneous" with the enactment of the General Allotment Act. *Id.* at 8–9. The Court concluded the opinion with the observation that the exemption in § 5 was consistent with the overall purpose of the General Allotment Act:

> Unless the proceeds of the timber sale are preserved for respondent, he cannot go forward when declared competent with the necessary chance of economic survival in competition with others. This chance is guaranteed by the tax exemption afforded by the General Allotment Act, and the solemn undertaking in the patent.

*Id.* at 10.

108

The analysis in *Squire* v. *Capoeman* has been applied in a number of subsequent cases in the federal courts of appeals. In those cases arising under the General Allotment Act or other acts construed by the courts *in pari materia* with that act, the courts have generally held that income derived directly from the ownership of restricted allotted land is exempt from federal taxation. *See, e.g., Stevens* v. *Commissioner*, 452 F.2d 741 (9th Cir. 1971); *United States* v. *Hallam*, 304 F.2d 620 (10th Cir. 1962); *see also Big Eagle* v. *United States*, 300 F.2d 765 (Ct. Cl. 1962). Income that is not derived directly from the taxpayer's individual ownership of the land or that is derived from the owner-ship or use of unrestricted or unallotted land, however, is subject to taxation. *See, e.g., United States* v. *Anderson*, 625 F.2d 910 (9th Cir.) (income from cattle ranching on reservation land), *cert. denied*, 450 U.S. 920 (1980); *Jourdain* v. *Commissioner*, 617 F.2d 507 (8th Cir.) (income earned as chairman of tribal council), *cert. denied*, 449 U.S. 839 (1980); *Fry* v. *Commissioner*, 557 F.2d 646 (9th Cir. 1977) (income from logging operation on reservation land), *cert. denied*, 434 U.S. 1011 (1978); *Holt* v. *Commissioner*, 364 F.2d 38 (8th Cir. 1966) (income from grazing on reservation land), *cert. denied*, 386 U.S. 931 (1967); *Commissioner* v. *Walker*, 326 F.2d 261 (9th Cir. 1964) (income earned as employee of the Indian community).

These cases interpret *Squire* v. *Capoeman* to teach that a tax exemption must derive from some particular language in a treaty or statute, although that language need not specifically set out a tax exemption, and that an exemption may not be based on policy alone or on generalized references to treaties and statutes. In *United States* v. *Anderson*, the Ninth Circuit explained the *Squire* analysis as follows:

> The rule that ambiguous statutes and treaties are to be construed in favor of Indians applies to tax exemptions, . . . but this rule "comes into play only if such statute or treaty contains language which can reasonably be construed to confer income tax exemp-tions." "The intent to exclude must be definitely expressed, where, as here, the general language of the Act laying the tax is broad enough to include the subject matter."

625 F.2d at 913 (citations omitted). The court explained further that although "policy arguments are fruitless in the absence of statutory or treaty language that arguably is an express tax exemption," they "might persuade courts to construe such arguable language, if any exists, actually to be an express tax exemption." *Id.* at 914 n.6.

In *Karmun* v. *Commissioner*, 749 F.2d 567 (9th Cir. 1984), the Ninth Circuit applied this analysis in a case arising under the Reindeer Industry Act of 1937, 25 U.S.C. § 500. That Act authorizes the Secretary of the Interior to acquire for the Alaskan natives reindeer and other property owned by non-natives. The Secretary is authorized to distribute or hold in trust the reindeer and other property, and to organize, manage, and regulate the reindeer industry in such a manner as to establish and maintain for the Alaskan natives a self-sustaining

109

business. *See* 749 F.2d at 569. The court rejected the claim made by Indians who operated herds of reindeer under that Act that their income should be exempt from federal taxation under the *Squire* v. *Capoeman* rationale. The Court noted that "[i]ncome is tax exempt under *Squire* only when the governing treaty or statute contains language which can reasonably be construed to confer an exemption," and it found "no clear expression of intent to exempt" in the Reindeer Act. 749 F.2d at 570. In addition, the court found it significant that the purposes of the General Allotment Act and the Reindeer Act were different:

> The purpose of the [General Allotment Act] was to benefit the individual allottees by preparing them to become independent citizens. Accordingly, the *Squire* Court found that the tax exemption was crucial to fulfilling this purpose. By contrast, the purpose of the Reindeer Act is to provide a continuing food source to the Eskimos of northwestern Alaska through the establishment of a native operated reindeer industry. That purpose is not undermined by requiring the owners and operators of reindeer herds to pay federal income taxes on their profits from the successful conduct of such operations.

*Id.* (citations omitted).

The issue we have been asked to address — the taxability of treaty fishing rights — has been considered twice by the Tax Court, once before the *Squire* decision and once again in 1982. *See Strom* v. *Commissioner*, 6 T.C. 621 (1946), *aff'd per curiam*, 158 F.2d 520 (9th Cir. 1947); *Earl* v. *Commissioner*, 78 T.C. 1014 (1982). In both *Strom* and *Earl*, the Tax Court concluded that income earned by the Indians from the exercise of treaty fishing rights is subject to federal tax. In *Strom*, the court rejected the argument advanced by the Indians that imposition of a tax upon income earned in carrying on a commercial fishing business is a restriction on the right to fish guaranteed by treaty:

> The Quinaielt Indians on the reservation were as free to fish in the Quinaielt River after the imposition of an income tax as they were prior to that time. The disputed income tax is not a burden upon the *right to fish*, but upon the income earned through the exercise of that right.

6 T.C. at 627. Noting that there was no express exemption from tax in the treaty, and that the income involved was derived "personally" by a restricted Indian (rather than in trust), the Tax Court concluded that the income was subject to the general provisions of the Internal Revenue Code. *Id.* at 627–28.

In *Earl*, the petitioner relied on *Squire* v. *Capoeman* as a basis for his claimed tax exemption, arguing that income from fishing in the usual and accustomed fishing grounds is analogous to income from the cutting of timber

110

from allotted lands.[9] The Tax Court rejected that analogy, finding instead that the treaty language guaranteeing the right to fish "contains nothing dealing with the taxation of income derived from such fishing." 78 T.C. at 1017. Moreover, it found that the right of an Indian to share in treaty fishing rights is more like his rights as a member of the tribe in unallotted land on the reservation (income from which would not be exempt under *Squire*) than individual rights in allotted land (income from which would fall within the "free from charge or incumbrance" language analyzed in *Squire*). *Id.*

In contrast to its treatment of cases involving federal taxation, the Supreme Court has repeatedly held that Indians and their property are exempt from *state* taxation within their reservations, unless Congress clearly manifests its consent to such taxation. *See Montana* v. *Blackfeet Tribe of Indians*, 471 U.S. 759, 764–65 (1985); *McClanahan* v. *Arizona State Tax Comm'n*, 411 U.S. 164, 170–71 (1973). Those decisions rest on a preemption rationale, as explained by the Court in *Bryan* v. *Itasca County*, 426 U.S. 373 (1976):

> The *McClanahan* principle derives from a general pre-emption analysis that gives effect to the plenary and exclusive power of the federal government to deal with Indian tribes, and "to regulate and protect the Indians and their property against interference even by a state." This pre-emption analysis draws support from "the 'backdrop' of the Indian sovereignty doctrine," "'the policy of leaving Indians free from state jurisdiction and control which is deeply rooted in the Nation's history,'" and the extensive federal legislative and administrative regulation of Indian tribes and reservations. "Congress has acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation," and therefore "'State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply.'"

*Id.* at 376 n.2 (citations omitted). Property and income earned outside the reservation, however, have generally been held to be subject to nondiscriminatory state taxation, unless federal law otherwise provides for an exemption. *See Mescalero Apache Tribe* v. *Jones*, 411 U.S. 145, 148–49, 155–56 (1973) (holding that the state may impose gross receipts tax on ski resort operated by Indian tribe on off-reservation land).

## C. Positions of Interior and the IRS

Interior and the IRS both recognize that the relevant analysis here is that used by the Court in *Squire* v. *Capoeman*. The disagreement centers on whether

---

[9] Pleadings filed by some of the Indian tribes in the pending Tax Court proceedings state that the factual premise of the holding in *Earl* — that the income was earned through exercise of treaty fishing rights — is incorrect, because the individual involved, although an Indian, was fishing as a crewmember on a vessel owned by a non-Indian, and merely shared in proceeds of fishing attributable to non-Indian treaty shares.

111

the treaty language is sufficiently specific to meet the threshold requirements of *Squire*, and what role policy considerations play in interpreting that language.

## 1. Interior Position

Interior maintains that the treaty language expressly securing to the Indians the right of "taking fish at usual and accustomed grounds and stations" is language that meets the threshold requirement of *Squire* v. *Capoeman* that a tax exemption be based on specific language. It is language that is "directly applicable" to the fishing activity, and it does not state any limitation on the right other than that it is to be exercised in common with other citizens. Interior therefore argues that the language, on its face, "might well be read to prohibit any limitation on diminishment of the fishing right other than the one specified."

Interior acknowledges that the language "might also be read otherwise," but argues that, at a minimum, an ambiguity exists and, accordingly, that the treaty must be construed in the light most favorable to the Indians. *See generally Squire*, 351 U.S. at 7. Interior notes that at the time of negotiation of the treaty, the reference to the right of "taking fish at usual and accustomed grounds and stations" was clearly intended to include commercial fishing activities, *see Commercial Passenger Fishing*, 443 U.S. at 665–66 & n.7, 676, and that the Indians were assured that they would be able to fish and trade as they had prior to the treaties — that is, without taxation and with no obligation to turn over a portion of their fishing catch or proceeds to the federal government. Thus, Interior reasons that "it is no more likely that the Indians understood that the federal government would tax their fishing right than that they understood that future states would be able to impose a charge upon it."[10]

## 2. IRS Position

The IRS contends that the interpretation advanced by Interior would be "an unwarranted expansion of the principles announced in *Squire* v. *Capoeman*." The IRS believes that the treaty language granting the fishing rights cannot reasonably be construed to create a tax exemption. The IRS views Interior's position as a policy argument of the type the courts have rejected as a sole basis for a tax exemption, and views the "non-tax cases" cited by Interior (that is,

---

[10] This argument is considerably expanded in the pleadings filed by Indian tribes in the Tax Court proceedings. Those tribes have opposed motions for summary judgment filed by the IRS on the ground, *inter alia*, that "a decision cannot be made without a thorough understanding of the historical and anthropological data surrounding the negotiation of the Treaty," which can be presented only at trial. *See, e.g.*, Brief for Petitioner at 2, *Jefferson* v. *Commissioner*, No. 836–84 (T.C. Apr. 18, 1985). A number of affidavits have been offered with those pleadings to provide a foundation for petitioners' claims that at trial they will demonstrate that the Indians negotiating the treaties did not contemplate that the United States would be allowed to tax or otherwise to take a share of the fishery that the Indians reserved for themselves. The tribes also argue that there is no evidence that the United States attempted to negotiate for the right to tax treaty fishing income in the treaty negotiations or understood that the treaty gave it that right, and that there is no suggestion in the numerous Supreme Court and lower federal court decisions construing treaty fishing rights that "one of the federal purposes in negotiating these agreements was to enable [the government] to raise revenue from the Indians' commerce." *Id.* at 6.

those cases construing the treaty fishing rights) as inapposite, because they merely "clarify the rights which the treaties guarantee — rights which we are disputing only to the extent that Interior is reading them to convey a specific tax exemption." Accordingly, the IRS maintains that the reasoning of the Tax Court in *Strom* and *Earl* is persuasive, and should be followed by the IRS in its enforcement efforts.

## II. Analysis

The dispute between Interior and the IRS arises out of an inherent tension between two applicable and longstanding canons of construction: first, that regardless of the circumstances, exemptions from federal income taxation be "definitely expressed," *see supra* note 8 and accompanying text; and second, that treaties and statutes affecting Indians be interpreted liberally, in light of the trust responsibility of the United States and bearing in mind the Indians' historically inferior bargaining position, which characterized the negotiation of the treaties, *see supra* text immediately preceding Part I.B. Unfortunately, the courts have not been wholly consistent in describing how the balance between the competing canons should be struck. In *Squire*, the Court noted that the "free from charge or incumbrance" language of § 5 was not "expressly couched in terms of nontaxability," but found that the words used were "susceptible of a more extended meaning than their plain import, as connected with the tenor of their treaty." 351 U.S. at 7. In *Choteau* v. *Burnet*, the Court stated that the intent to exclude income from taxation must be "definitively expressed." 283 U.S. at 696. The language used in *United States* v. *Anderson* referred both to the need for "express exempting language in a statute or treaty," 625 F.2d at 917, and to statutory or treaty language "that arguably is a tax exemption," *id.* at 914 n.6. In *Holt* v. *Commissioner*, the court referred to language that "can reasonably be construed to confer income tax exemptions." 364 F.2d at 40.

Nor have the courts articulated precisely what types of underlying considerations would be persuasive in construing specific language to be a tax exemption. Although the courts have generally rejected arguments that the general goal of increased economic opportunities for Indians justifies an exemption from federal income taxes, they have nevertheless recognized that the federal government's responsibility to the Indians must color interpretation of treaty rights and obligations. Moreover, there are few concrete examples to guide our analysis, because as far as we are aware, the only specific language that has been analyzed by the courts for the purpose of determining whether a federal tax exemption exists is the language in §§ 5 and 6 of the General Allotment Act.

Although in the absence of direct guidance from the courts it is difficult to determine definitively whether the treaty language falls within the *Squire* rationale, we believe that the position taken by the IRS represents the more sound view of the law. For this reason, as we discuss below, we believe that if the pending cases proceed to the federal courts, the Department of Justice could argue the position set out by the IRS.

113

Interior has argued that because the treaty contains some language dealing with fishing rights, the threshold *Squire* v. *Capoeman* test has been met. We believe that is an overly broad reading of *Squire*. There is a significant difference between the specific language relied upon by the Court in *Squire* and the language relied upon by Interior to support a tax exemption. In *Squire*, and in its preceding decisions in *Choteau* and *Five Civilized Tribes*, the Court emphasized that the language creating a tax exemption must be specific and clear, because the language of the Internal Revenue Code otherwise plainly encompasses income earned by Indians from any source. *See supra* note 8 and accompanying text. In *Choteau* and *Five Civilized Tribes*, the Court did not find such language, even in the face of express treaty guarantees of exclusive use of reservation land (language that the Court did not address). The difference in *Squire* was the presence of specific statutory language that, although not expressly mentioning taxation, expressly dealt with "charges" and "incumbrances" that might be levied on the allotted land. In addition, the Court had the benefit of other literal language in the statute dealing with the grant of the land in fee simple to the Indians, which expressly included taxation as a restriction that otherwise might be applicable to the land. Thus, it was not difficult for the Court to conclude that Congress intended to include taxation (including taxation of income derived directly from the land) as a "charge or incumbrance" within the meaning of § 5 of the General Allotment Act.

Here the treaty language granting Indians the "right of taking fish" does not contain any comparable specific language dealing with "charges," "incumbrances," "restrictions," or other types of limitations. Rather, that language merely grants a particular right. It is more analogous to broad treaty language granting the Indians exclusive use of reservation land,[11] or language in the General Allotment Act granting Indians rights to allotted lands[12] — neither of which was even considered by the Court in *Squire* or subsequent cases. On its face, then, the treaty language lacks the specificity and focus of the language at issue in *Squire*.

To be sure, the Supreme Court, in considering the scope of the "right of taking fish," suggested that the only permissible limitations on that right are reasonable, nondiscriminatory regulations designed to conserve the fish (and thereby preserve the fishing right). *See, e.g., Puyallup II*, 414 U.S. at 45, 48; *Puyallup I*, 391 U.S. at 398. As noted above, however, the Court has not considered the question whether taxation of the income earned from the exercise of the fishing right is or is not contemplated by the treaty language. We

---

[11] *See, e.g.*, Treaty of Olympia, art. II, 12 Stat. at 971:

> There shall . . . be reserved, for the use and occupation of the tribes and bands aforesaid, a tract or tracts of land sufficient for their wants within the Territory of Washington, to be selected by the President of the United States, and hereafter surveyed or located and set apart for their exclusive use, and no white man shall be permitted to reside thereon without permission of the tribe and of the superintendent of Indian affairs or Indian agent.

[12] *See, e.g.*, 25 U.S.C. § 331 (authorizing allotment to each Indian located upon a reservation); *id.* § 334 (granting allotments to Indians not residing on reservations), *id.* § 336 (granting allotments to Indians making settlement on unappropriated lands).

114

believe that taxation of the income earned from the exercise of the treaty fishing right would have a qualitatively different effect on those rights than did the restrictions struck down by the Court in the treaty cases. The latter restrictions involved an actual limitation on the ability or opportunity of the Indians to take fish at the treaty locations — such as prohibitions on access, the use of physical devices that diminish or destroy the runs of fish available to the Indians, and license fees required as a prerequisite for exercise of fishing rights. *See* discussion *supra* Part I.A. An income tax on the profits received from exercise of those fishing rights, although it may diminish the economic value of the right, does not interfere with the scope of the right itself — that is, the right to take a reasonable share of the available fish.

The taxation of profits earned from the exercise of treaty fishing rights will, of course, have an economic impact on Indians who earn that income. But the reduction of the economic value of a right guaranteed to the Indians has generally not been considered to be sufficient reason, standing alone, to create a tax exemption. *See, e.g, United States* v. *Anderson*, 625 F.2d at 914 n.6 ("*Capoeman* and every other Supreme Court and Ninth Circuit case have held that such policy arguments are fruitless in the absence of statutory or treaty language that arguably is an express tax exemption."); *Fry* v. *United States*, 557 F.2d at 649 ("[I]t is one thing to say that courts should construe treaties and statutes dealing with Indians liberally, and quite another to say that, based on those same policy considerations which prompted the canon of liberal construction, courts themselves are free to create favorable rules."). That the right was created by language in a treaty does not provide an exception to the general rule favoring taxation, when that language merely establishes the existence of the right in broad terms. Otherwise, *Squire* v. *Capoeman* would be reduced to quite mechanical operation: that is, if a right is granted to Indians by express language in a statute or treaty that benefits the Indians economically, income earned from exercise of that right is exempt from federal income taxation. We believe that conclusion is inconsistent with *Squire*, as well as with the conclusions in *Choteau* v. *Burnet* and *Five Civilized Tribes*.[13]

In addition, in *Squire* the Court was able to point to a direct link between the tax exemption and the purpose of the statute, which was to grant individual Indians an unencumbered right to their allotted land, when they were judged ready to assume full responsibility for that land and the obligations flowing from ownership. During the period of trusteeship, that purpose could be thwarted

---

[13] If *Squire* were to be read that broadly, we would have difficulty developing a principled distinction between cases in which a right is granted by express language and cases in which a right is implied. For example, the statute at issue in *Karmun* v. *Commissioner*, the Reindeer Industry Act, arguably gave Indians an implied right to operate herds of reindeer for profit, subject to the supervision of the Secretary of the Interior. Similarly, treaties between the United States and Indians in the western states have generally been interpreted to grant implied rights to use water that is minimally necessary to carry out the needs of the tribe, even if no water is expressly guaranteed by the treaties. It seems to us that to the extent it is argued that the express grant of a right to Indians that has economic benefit carries with it a tax exemption, the argument should also apply to implied treaty rights. Clearly, however, that argument is inconsistent with the Court's analysis in *Squire* and its repeated assertions that exemptions from taxation must be clearly and definitively expressed.

115

by taxation of income received directly from use of the land, because a failure to pay that tax could result in a tax lien on the property. *See* 351 U.S. at 10. Here, however, the link is much more tenuous, for it is difficult to argue that taxation of the net income derived from exercise of the fishing right would threaten the continued availability of that right. Accordingly, this situation is analogous to that described by the Court in *Karmun* v. *Commissioner*:

> Moreover, as the Tax Court observed, the purpose of the legislation involved here [the Reindeer Industry Act] is entirely different from that in *Squire*. The purpose of the [General Allotment Act] was to benefit the individual allottees by preparing them to become independent citizens. Accordingly, the *Squire* Court found that the tax exemption was crucial to fulfilling this purpose. By contrast, the purpose of the Reindeer Act is to provide a continuing food source to the Eskimos of northwestern Alaska through the establishment of a native-operated reindeer industry. That purpose is not undermined by requiring the owners and operators of the reindeer herds to pay federal income taxes on their profits from the successful conduct of such operations.

749 F.2d at 570 (citations omitted).

Nor do we find persuasive the further argument that because neither the Indians nor the United States contemplated, at the time the treaties were negotiated, that income derived from commercial fishing would be taxable, the rights reserved by the Indians include the right to be free from taxation. This argument, if taken to its logical extreme, would require that all income earned by Indians deriving from the exercise of a treaty or statutory right that predates the federal income tax be exempt from that tax. In *Choteau, Five Civilized Tribes*, and *Squire*, the Supreme Court implicitly rejected that argument, holding that Indians are not exempt from federal income taxation merely because of their status as Indians (that is, as formerly sovereign people who had not been subject to the tax), but rather could claim an exemption only on the basis of specific treaty or statutory language indicating an intent to exempt them.

Furthermore, this argument, again if taken to its logical extreme, would mean that the courts could never take account of changes in conditions, laws, or regulations that postdate negotiation of the treaties — a view that would, we believe, stretch the canon of construction favoring interpretation of treaties as the Indians understood them beyond the scope intended by the Supreme Court. As the Court stated in *Kennedy* v. *Becker*, 241 U.S. 556, 563 (1916):

> It has frequently been said that treaties with the Indians should be construed in the sense in which the Indians understood them. But it is idle to suppose that there was any actual anticipation at the time the treaty was made of the conditions now existing to which the legislation in question was addressed.

116

Finally, we do not believe the cases dealing with state taxation of Indians are relevant to the question of federal taxation. As discussed above, *see supra* text immediately preceding Part I.C, those cases rest on a preemption rationale that is not pertinent to interpretation of federal law:

> Royalties received by the government from mineral leases of Indian lands have been held to be beyond a State's taxing power on the ground that, while in the possession of the United States, they are a federal instrumentality, to be used to carry out a governmental purpose. It does not follow, however, that they cannot be subjected to a federal tax.

*Choteau* v. *Burnet*, 283 U.S. at 696 (citations omitted).

## Conclusion

For these reasons, we conclude that the position maintained by the IRS that income earned from exercise of treaty fishing rights is subject to the federal income tax is the more sound view of the law. We believe that position is fully consistent with the applicable Supreme Court precedents and is consonant with the trust relationship held by the United States with respect to Indian tribes.

ALLAN GERSON
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
